IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**MICHAEL A. BACK,**

      **Plaintiff,**

  v.                                                  **Civil Action 2:15-cv-2831**
                                                         **Judge James L. Graham**
                                                         **Magistrate Judge Jolson**

**COMMISSIONER OF SOCIAL
SECURITY,**

      **Defendant.**

### REPORT AND RECOMMENDATION

Plaintiff, Michael A. Back, filed this action under 42 U.S.C. §§ 405(g) and 1383(c) seeking review of a final decision of the Commissioner of Social Security (the "Commissioner") denying his applications for disability insurance benefits ("DIB") and supplemental social security income ("SSI"). For the reasons that follow, it is **RECOMMENDED** that the District Court **REVERSE** the Commissioner's nondisability finding and **REMAND** this case to the Commissioner and the Administrative Law Judge under Sentence Four of § 405(g).

### I. BACKGROUND

**A.**     **Prior Proceedings**

Plaintiff filed his DIB application on August 5, 2012, and his SSI application on August 6, 2012, both alleging a disability onset date of March 6, 2012. (Doc. 11-5 at Tr. 142–44, PAGEID #: 201–03; *id.* at Tr. 151–52, PAGEID #: 210–11). After denials of his claims (*see* Doc. 11-4 at Tr. 98–109, PAGEID #: 156–67), Plaintiff appeared for a hearing before Administrative Law Judge Edmund E. Giorgione ("the ALJ") on August 14, 2014 (Doc. 11-2 at Tr. 39, PAGEID #: 95). The ALJ denied benefits on September 8, 2014. (*Id.* at Tr. 31–32,

1

PAGEID #: 87–88). That became the Commissioner's final decision when the Appeals Council denied review on July 20, 2015. (*Id.* at Tr. 1–12, PAGEID #: 57–68). Plaintiff appeals, arguing that the ALJ improperly discounted his credibility regarding the severity of his impairments. (Doc. 11-1–11-8 (administrative record); Doc. 12 (statement of errors); Doc. 18 (memorandum in opposition)).

B.     **Plaintiff's Testimony at the Administrative Hearing**

At the time of the administrative hearing, Plaintiff was 43 years old with an eleventh grade education. (Doc. 11-2 at Tr. 41, 42, PAGEID #: 97, 98). Prior to his alleged onset date, Plaintiff remained continuously employed, including as an operation safety manager, dispatcher, machine operator for a veneer-production company, hotel manager, manager of a Subway franchise, emergency room tech, and private security guard. (*See id.* at Tr. 41–45, PAGEID #: 97–101; *id.* at Tr. 46, PAGEID #: 102 (Plaintiff testifying that he was never terminated and that he left each position because he was trying to find the "right job")).

Plaintiff's injury testimony concerned his neck and back pain, both of which he claimed prevented him from working. (*Id.*). He testified that he experienced numbness in his feet, legs, and fingers (*id.* at Tr. 46, 48, PAGEID #: 102, 104), and that the pain radiated from his lower back into his neck when he sat down (*id.* at Tr. 46, PAGEID #: 102). According to his testimony, Plaintiff's back pain was bad enough that it required him to spend "pretty much all day" lying on the floor (*id.* at Tr. 47, PAGEID #: 103), and kept him from sleeping more than "about three hours" per night "at the max" (*id.* at Tr. 52, PAGEID #: 108). At the time of the hearing, Plaintiff took eight Percocet pills per day for pain management. (*Id.* at Tr. 53, PAGEID #: 109 (Plaintiff describing his pills as "10mg, 325"); *see id.* ("We was taking more . . . . maxing it out at 12 and I didn't feel comfortable doing that . . . so we decided to go back to eight . . . .")).

Plaintiff communicated with family and friends via phone but said he was not able to socialize much in person given his physical condition. (*See id.* at Tr. 48, PAGEID #: 104). He rarely attended church, could go to the grocery store only for short amounts of time, had difficulty driving, and was unable to help with household chores due to his limitations. (*See id.* at Tr. 48–49, PAGEID #: 104–05; *see also id.* at Tr. 49, PAGEID #: 105 ("It's hard for me to look over my left side at all . . . ."); *id.* at Tr. 55, PAGEID #: 111 (Plaintiff testifying he no longer fishes or hunts because of his back pain)). When asked how much he could lift, Plaintiff said he "wouldn't be comfortable going much over probably even a gallon of milk." (*Id.* at Tr. 47–48, PAGEID #: 103–04). He testified that he used a cane, which he was prescribed. (*See id.* at Tr. 47, 52, PAGEID #: 103, 108). Plaintiff was briefly able to walk without a cane about "thirty yards" from his house to the post office but stopped after "the falling stuff" started. (*Id.* at Tr. 52, PAGEID #: 108).

During the hearing, the ALJ acknowledged that Plaintiff "had three surgeries" on his back and neck within "the past couple of years." (*Id.* at Tr. 51, PAGEID #: 107). Plaintiff then testified that his "neck did get quite a bit better there for a while" after his second surgery, but that his pain eventually resurfaced. (*Id.* ("That's wh[y] we're thinking the tinging of the fingers [is] coming back and stuff like that.")). The ALJ also acknowledged Plaintiff "had to stand up a couple of times" at the hearing, which Plaintiff said he did "to deal with pain." (*Id.* at Tr. 55, PAGEID #: 111).

C.  **The Medical Records**

Prior to his first surgery, Plaintiff saw his primary-care physician, Dr. Joseph Trapp, on April 17, 2012. Plaintiff complained of neck and arm pain, although he did not have numbness in his arms or hands and did have normal motor strength. (*See* Doc. 11-7 at Tr. 259–60,

PAGEID #: 320–21).  Dr. Trapp also noted that Plaintiff's recent MRI results revealed a herniated disc in Plaintiff's back.  (*See id.*; *see also id.* at Tr. 261, 270, PAGEID #: 322, 331–41 (previous visit notes showing that Plaintiff also underwent shoulder surgery in April 2011)). Plaintiff saw Dr. Trapp again on May 7, 2012, for back and arm pain.  (*See id.* at Tr. 257, PAGEID #: 318).  Plaintiff did not have any numbness in his arms and hands, had normal motor strength "on right and diminished on left," and had "[g]ood range of motion of the cervical spine." (*Id.* at Tr. 258, PAGEID #: 319).

Contemporaneous imaging reports and treatment notes confirm Plaintiff's back and neck impairments during the spring of 2012.  (*See id.* at Tr. 281–82, PAGEID #: 342–43 (April 6, 2012, radiology report noting problems with Plaintiff's cervical and lumbar spine); *id.* at Tr. 268, PAGEID #: 329 (April 11, 2012, report analyzing Plaintiff's MRI and concluding: "1. Left paracentral disc protrusion involving C7-T1, abutting the left C8 nerve root. 2. Broad asymmetric disc protrusion involving C6-C7, abutting the left C7 nerve root. 3. Right paracentral disc protrusion involving C5-C6, resulting in right hemicord effacement."); *id.* at Tr. 283–84, PAGEID #: 344–45 (April 24, 2012, orthopedic surgeon report diagnosing Plaintiff with a herniated cervical disc and noting Plaintiff's decreased range of neck motion)).

Plaintiff saw his neurosurgeon, Dr. William Zerik, on June 6, 2012, with neck and arm pain and some numbness in his left arm.  His gait and stance were normal, as were his motor and reflex exams.  Dr. Zerick observed Plaintiff's MRI results, which "demonstrated a disc herniation at C5-6 and on the left at C7-T1 compressing the left C8 nerve root." (*Id.* at Tr. 288, PAGEID #: 349).  Despite an epidural steroid injection for the pain (*see id.*), Dr. Zubick wrote after a follow-up visit on August 1, 2012, that Plaintiff "is really just miserable" (*id.* at Tr. 285, PAGEID #: 346).  Dr. Zerick observed that Plaintiff "continues with his severe left radicular arm

4

pain in a C8 distribution from a disc bulge at the C7-T1 level" as well as "some hand weakness and numbness in his fourth and fifth digits." (*Id.*). Dr. Zerick recommended another epidural steroid injection, followed by surgery if the injection failed to provide more lasting relief. (*See id.*). Plaintiff's pain persisted through September 2012. (*See, e.g.*, *id.* at Tr. 293, PAGEID #: 354 (Plaintiff complaining of "aching" pain his neck and "stabbing" pain in his low back); *id* at Tr. 295, PAGEID #: 356 (noting that any "improvement of pain levels" through Plaintiff's course of treatment, which included chiropractic exams and physical therapy, was "not lasting"); *id.* at Tr. 474, PAGEID #: 535 (Plaintiff complaining of continued neck pain in a September 5, 2012, visit to Dr. Trapp)). He opted for surgery.

### 1. Surgery 1: October 12, 2012

On October 12, 2012, Plaintiff underwent neck surgery to address his neck pain, left arm pain, and hand pain. (*See* Doc. 11-7 at Tr. 375, PAGEID #: 436). Two days after his procedure, Plaintiff went to the hospital to have his incision drained; he also complained of "increasing neck pain" and "some numbness in his fingers and left arm." (Doc. 11-8 at Tr. 584, PAGEID #: 646). He saw Dr. Zerick again on October 17, 2012, and demonstrated a decrease in his left grip strength and "decreased sensation on the left in a C7-C8 distribution." (Doc. 11-7 at Tr. 549, PAGEID #: 610). On October 25, 2012, he followed up with Dr. Zerick's office, complaining of "a combination of neck and left shoulder and arm pain." (*Id.* at Tr. 551, PAGEID #: 612). He had the same complaints during a follow-up visit with Dr. Zerick's office on October 31, 2012. (*See id.* at Tr. 552, PAGEID #: 613; *see also id.* at Tr. 468, PAGEID #: 529 (visit to Dr. Trapp for neck pain on November 28, 2012)).

Plaintiff's pain continued into 2013 and he sought treatment in January and February of that year. (*See, e.g.*, *id.* at Tr. 507, PAGEID #: 568 (visit to Licking Memorial Hospital on

5

January 29, 2013, for back and neck pain); *id.* at Tr. 518, PAGEID #: 579 (visit on February 5, 2013, for back pain)). Multiple follow-up visits with Dr. Trapp in January and February 2013 also show that Plaintiff continued to struggle with neck and arm pain, as well as numbness in his arms. (*See, e.g.*, *id.* at Tr. 463, PAGEID #: 524 (January 3, 2013, visit to Dr. Trapp for neck pain indicating diminished strength on Plaintiff's left side); *id.* at Tr. 461, PAGEID #: 522 (January 30, 2013, visit for neck pain and "[r]adicular [left] arm pain"); *id.* at Tr. 460, PAGEID #: 521 (February 13, 2013, visit where Plaintiff demonstrated diminished arm strength and motor skills).

Plaintiff had another MRI in February 2013. It revealed a "[l]arge degenerative Schmorl's node defect" and "paracentral disc buldge" in his neck. (*Id.* at Tr. 299, PAGEID #: 360). His pain continued through February and into April. (*See, e.g.*, *id.* at Tr. 553, PAGEID #: 614 (February 20, 2013, note by Dr. Zerick, Plaintiff's first surgeon: "I got a report that says he has a disc herniation on the left at C7-T1. He is having more back than neck pain and pain in the harm. He has been hospitalized a couple of times."); *id.* at Tr. 314, PAGEID #: 375 (notes from Plaintiff's visit to Licking Memorial Hospital on April 8, 2013, documenting Plaintiff's lower back pain that radiated into his testicles—pain that Plaintiff described as "constant" and a "9" on "a scale 0-10")).

In April 2013, Plaintiff saw Dr. Ammirati, a surgeon affiliated with Ohio State University, about his pain. Dr. Ammirati analyzed Plaintiff's problems since his October 2012 surgery. He noted that Plaintiff had experienced "decreased triceps strength" and "decreased hand grip," did "not have [a] triceps reflex" in his left arm, and was experiencing a diminished sensation in three of the fingers on his left hand. (*Id.* at Tr. 382, PAGEID #: 443; *see also id.* at Tr. 375, PAGEID #: 436 (Dr. Ammirati noting that Plaintiff "had failed conservative therapy

6

prior to his first surgery and unfortunately did not get significant relief post-operatively")). Dr. Ammirati reviewed Plaintiff's February MRI results, which he found "positive for herniated dis[c]s at C6/7 and C7/T1." (*Id.*). Reports from Plaintiff's visits to Dr. Trapp around the same time corroborate these issues. (*See, e.g.*, *id.* at Tr. 456, PAGEID #: 517 (Plaintiff reporting neck pain on a March 25, 2016, visit to Dr. Trapp)). After talking with Dr. Ammirati, Plaintiff agreed to try surgery again. (*See id.* at Tr. 382, PAGEID #: 443).

### 2. Surgery 2: May 8, 2013

Plaintiff underwent a second neck surgery on May 8, 2013. (*See* Doc. 11-7 at Tr. 398, PAGEID #: 459 (notes from surgery stating that Plaintiff underwent a "C6-7, C7-T1 anterior cervical dis[c]ectomy," "[i]nsertion of cage between C6-7 and C7-T1," "[i]nsertion of plate between C6-7 and C7-T1," and "[f]usion of C6 to C7 and C7 to T1")). His initial follow-up visit with Dr. Trapp on May 16, 2013, indicated that Plaintiff's neck still hurt but that he felt some relief in his arms from the surgery. (*See id.* at Tr. 450, PAGEID #: 511). Plaintiff then saw Dr. Ammirati in June 2013 and reported improvement in his neck pain post-surgery. (*See id.* at Tr. 380, PAGEID #: 441).

As Plaintiff's neck pain temporarily subsided, his back pain increased. During his June 2013 visit to Dr. Ammirati, Plaintiff complained of numbness down his left leg and into his foot. (*See id.* at Tr. 431, PAGEID #: 492). He also said that his back pain had worsened since May 2013 (*see id.*) after he tripped "over his flip flop a few days [prior] and fell" (*id.* at Tr. 380, PAGEID #: 441). He was "afraid of falling again" because "his leg g[a]ve[] out a little" when he walked. (*Id.* (quotation omitted); *see also id.* at Tr. 502–04, PAGEID #: 563–65 (reports from the June 8, 2013, visit to Ohio State noting pain in Plaintiff's left hip and that he had a positive straight leg test)). Dr. Ammirati further noted Plaintiff's "long history of low back pain" that had

7

"been progressively worsening" since his May surgery. (Doc. 11-7 at Tr. 371, PAGEID #: 432). Plaintiff told Dr. Ammirati that he experienced numbness in his legs, pain that shot down both legs and into his feet and toes, and disrupted sleep. (*See id.*).

Further evaluation at Ohio State prior to his next surgery indicated a "disc protrusion at L4-5" and a "[m]ild disc bulge [at] L5-S1" in Plaintiff's lower back. (*Id.* at Tr. 406, PAGEID #: 467). Notes from a consultation with doctors at Ohio State in July 2013 demonstrated an improvement in neck pain (*see id.* at 478, PAGEID #: 540 ("his [neck] symptoms have almost completely improved")), but that Plaintiff also continued to face a "great deal" of back pain that radiated down both legs, numbness in his legs, decreased sleep from the back pain, and an inability to walk for very long (*id.*). During visits to Dr. Trapp in June and July 2013, Plaintiff also complained of lower back pain that spread into his legs. (*See id.* at Tr. 445–47, PAGEID #: 506–08). After his back pain worsened, he opted to try another surgery for relief. (*See id.* at Tr. 396, PAGEID #: 457).

      3.    **Surgery 3:**    **August 7, 2013**

Plaintiff underwent "a posterior lumbar interbody fusion" on August 7, 2013 (*id.* at Tr. 526, PAGEID #: 587), in which Dr. Ammirati and his team placed screws and rods between Plaintiff's L4 and L5 vertebrae and then fused them together (*see id.* at Tr. 352, 368 PAGEID #: 413, 429). During a follow-up visit with Dr. Trapp in mid-August, Plaintiff reported muscle spasms in his back, and pain that extended down into his legs. (*See id.* at Tr. 443, PAGEID #: 504). Plaintiff sought treatment for the same thing in October 2013. (*See id.* at Tr. 440, PAGEID #: 501). Plaintiff saw Dr. Trapp again in April 2014, this time for neck pain and numbness in his arms and hands. (*See* Doc. 11-8 at Tr. 633, 634 PAGEID #: 695, 696 (noting

diminished strength on Plaintiff's side, no left biceps reflex, and diminished motor strength on the left side)).

**D.     The ALJ's Decision**

The ALJ issued his decision on September 8, 2014.  He found the following severe impairments: "degenerative disc and joint disease of the lumbar, thoracic, and cervical spine; status-post cervical hemlaminotomy, anterior cervical discectomy and fusion; status-post lumbar fusion; and status-post left shoulder arthroscopy."  (Doc. 11-2 at Tr. 21, PAGEID #: 77).  In assessing Plaintiff's residual functional capacity ("RFC"), he concluded Plaintiff could perform work at a light level of physical exertion.  (*See id.* at Tr. 25, PAGEID #: 81).  In making that assessment, the ALJ found Plaintiff's testimony "not entirely credible" regarding the extent of his impairment-related symptoms.  (*See id.* at Tr. 26, PAGEID #: 82).  The ALJ acknowledged Plaintiff's surgeries and pain, but focused on citations to the record showing any periods of improvement.  (*See id.* at Tr. 26–28, PAGEID #: 82–84; *see also, e.g.*, *id.* at Tr. 26, PAGEID #: 82 (noting that Plaintiff denied numbness in the arms and hands at one of his doctor's visits); *id.* at Tr. 27, PAGEID #: 83 ("[M]uscle tone was normal in both upper and lower extremities.")).  The ALJ concluded by finding there were jobs in the national economy that Plaintiff could perform and denied benefits.  (*See id.* at Tr. 29–31, PAGEID #: 85–87).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards."  *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. §405(g).  "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to

9

support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  The Commissioner's findings of fact must also be based upon the record as a whole.  *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985).  To this end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision.  *TNS, Inc. v. Nat'l Labor Relations Bd.*, 296 F.3d 384, 395 (6th Cir. 2002).

### III. DISCUSSION

**A.     Plaintiff's Credibility**

An ALJ's credibility determination is accorded great weight and deference.  *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (citing *Gaffney v. Bowen*, 825 F.2d 98, 973 (6th Cir. 1987)).  However, "the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'"  *Rogers*, 486 F.3d at 247 (quoting Soc. Sec. Rul. 96–7p, 1996 WL 374186, at *4).  Credibility determinations must be clearly explained, *see Auer v. Sec'y of Health & Human Servs.*, 830 F.2d 594, 595 (6th Cir. 1987), and must enjoy substantial support in the record, *see Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994).  Credibility explanations as to the extent of a plaintiff's pain "will not pass muster" if they are "not consistent with the entire record and the weight of the relevant evidence."  *Rogers*, 486 F.3d at 248 ("Consistency between a claimant's symptom complaints and the other evidence in the record tends to support the credibility of the claimant, while inconsistency, although not necessarily defeating, should have the opposite effect.").

The ALJ found Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms . . . not entirely credible." (Doc. 11-2 at Tr. 26, PAGEID #: 82).  Plaintiff contends the ALJ failed to meet the credibility-determination standard.  He argues in

relevant part that the ALJ's credibility determination is not supported by substantial evidence—both because the ALJ failed to account for the fact that Plaintiff's back and neck pain did not improve after the three surgeries, and because he was selective in the parts of the record he cited to justify his conclusion.

1. **The ALJ's Failure to Account for Plaintiff's Continued Impairments**

The primary reason the ALJ gave for discounting Plaintiff's credibility was that the surgeries were "generally successful in relieving [Plaintiff's] symptoms" and pain. (*Id.* at Tr. 26, PAGEID #: 82); *see id.* at Tr. 27, PAGEID #: 83 ("In July 2013, the claimant told one source that his symptoms had almost completely improved and improved daily."); *id.* at Tr. 28, PAGEID #: 84 ("It is also noteworthy that the claimant no longer complained of serious neck or back pain or limitations following the May 2013 and August 2013 procedures."); *id.* ("[W]hile the claimant required two cervical spine procedures and one lumbar spine procedure, the evidence suggests that the claimant's symptoms improved significant[ly] postoperatively.")).

The record contradicts the ALJ's statement with respect to Plaintiff's first neck surgery in October 2012. Following his surgery, Plaintiff consistently presented with neck pain, arm pain, and numbness in his left arm up until his next surgery in May. (*See* Doc. 11-7 at Tr. 551, PAGEID #: 612 (October 25, 2012, follow-up appointment for "a combination of neck and left shoulder and arm pain"); *id.* at Tr. 507, PAGEID #: 568 (visit to Licking Memorial Hospital on January 29, 2013, for back and neck pain); *id.* at Tr. 518, PAGEID #: 579 (hospital visit on February 5, 2013, for back pain); *id.* at Tr. 460, PAGEID #: 521 (February 13, 2013, doctor's visit where Plaintiff demonstrated diminished arm strength and motor skills); *id.* at Tr. 456, PAGEID #: 517 (Plaintiff reporting neck pain on a March 25, 2016, visit to Dr. Trapp); *id.* at Tr. 382, PAGEID #: 443 (April 12, 2012, consultation with surgeon detailing "decreased triceps

11

strength," "decreased hand grip," no "triceps reflex" on left arm, and a diminished sensation in three of the fingers on left hand)). Contrary to the ALJ's explanation, Plaintiff's first surgery did not provide him any relief.

In addition, the record contradicts the ALJ's statement that Plaintiff "no longer complained of serious neck or back pain or limitations following" his third surgery on August 7, 2013. (*Id.* at Tr. 28, PAGEID #: 84; *see also id.* (asserting that Plaintiff's "most recent physical examinations show no significant abnormalities")). (Doc. 11-2 at Tr. 28, PAGEID #: 84). After his third surgery, Plaintiff reported—once in mid-August and once in October—muscle spasms in his back and pain extending down into his legs. (*See id.* at Tr. 443, PAGEID #: 504 (August 2013); *id.* at Tr. 440, PAGEID #: 501 (October 2013)). Also contrary to the ALJ's statement, Plaintiff visited Dr. Trapp in April 2014—after his third surgery—complaining of neck pain and numbness in his arms and hands. (*See* Doc. 11-8 at Tr. 633, 634, PAGEID #: 695, 696).

Plaintiff's visit to Dr. Trapp in April 2014 also undermines the ALJ's explanation of Plaintiff's improvements following his second neck surgery in May 2013. The ALJ pointed out that Plaintiff's neck pain improved after the second neck surgery (*see* Doc. 11-2 at Tr. 27, PAGEID #: 83), which is technically correct (*see, e.g.*, *id.* at 479, PAGEID #: 540 (July 19, 2013, treatment notes stating that "his [neck] symptoms have almost completely improved")). The improvement, however, was short lived: when Plaintiff saw Dr. Trapp for neck pain in April 2014, he exhibited "[r]adicular arm pain" and numbness in his arms, forearms, and hands. (Doc. 11-8 at Tr. 633, PAGEID #: 695; *see id.* at Tr. 634, PAGEID #: 969). The ALJ ignored that Plaintiff's neck pain resurfaced. (*See* 11-2 at Tr. 28, PAGEID #: 84). Stated another way, he improperly noted an "instance [where] the record show[ed] an improvement" in Plaintiff's pain, but then ignored a "corresponding" record demonstrating "continued impairment or a subsequent

12

decline." *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014); *see also Germany-Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports").

In short, the record contradicts the ALJ's primary reason for discounting Plaintiff's credibility. Plaintiff generally did not obtain pain relief after his surgeries. And any relief he did obtain was only temporary, a fact that the ALJ failed to appreciate. Based on this, the ALJ's credibility determination is "not consistent with the entire record and the weight of the relevant evidence" and therefore does "not pass muster." *Rogers*, 486 F.3d at 248.

2. **Selective Citations to the Record**

To the extent the ALJ tries to support his conclusion with citations to the record, Plaintiff claims the ALJ did so improperly. The ALJ cited a number of seemingly positive observations from Plaintiff's post-surgery treatment records to show that Plaintiff's pain could not have been as severe as Plaintiff's testimony and the hundreds of pages of medical records indicated. (*See, e.g.*, Doc. 11-2 at Tr. 26, PAGEID #: 82 (citing June 2012 treatment notes where "claimant denied numbness in the arms or hands," exhibited "good range of motion in the cervical spine," had a normal gait and stance, and his "motor and reflex exams were within normal limits")). Plaintiff argues that the ALJ erred by considering only parts of the record that supported his conclusion. *See Gentry*, 741 F.3d at 724; *Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 435 (6th Cir. 2013) (noting that an ALJ cannot "cherry-pick[] select portions of the medical record" when conducting his or her analysis); *see also Germany-Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) ("But, the judge was selective in parsing the various medical reports . . . ."); *Dotson v. Apfel*, 234 F.3d 1267, No. 99-6163, 2000 WL 1562817, at *1 (6th Cir.

13

Oct. 10, 2000) (noting that substantial evidence depends on "the record as a whole" (citing *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994))).

The Court agrees. In analyzing Plaintiff's condition after the first surgery, the ALJ noted that there were no objective indicators of any problems until Plaintiff's MRI in February 2013. (*See* Doc. 11-2 at Tr. 27, PAGEID #: 83). However, the ALJ ignored objective evidence of post-operative problems prior to that time. For example, Plaintiff saw Dr. Zerick on October 17, 2012, when he demonstrated a decrease in his left grip strength and "decreased sensation on the left in a C7-C8 distribution." (Doc. 11-7 at Tr. 549, PAGEID #: 610). And he saw Dr. Trapp again in early January 2013 and demonstrated an "absent or diminished" biceps reflex in his left arm. (*Id.* at Tr. 464, PAGEID #: 525; *see id.* at Tr. 462, PAGEID #: 523 (notes from a visit to Dr. Trapp on January 30, 3013, documenting the same set of issues)).

The ALJ also cited the record selectively in assessing Plaintiff's progress with neck pain after his second surgery. He noted, for example, that Plaintiff sought "emergency room care on one occasion in June 2013 complaining of exacerbated neck and back pain; however, follow-up notes indicate that [Plaintiff] was doing quite well since surgery." (Doc. 11-2 at Tr. 27, PAGEID #: 83 (citation omitted) (citing an 85-page section of the record for support)). He also explained that "emergency room notes document only mild tenderness to palpation at the lumbar spine with no neural deficits." (*Id.*). But the ALJ neglected to note Plaintiff's May 16, 2013, and June 17, 2013, visits to Dr. Trapp, who documented diminished strength and reflexes in Plaintiff's left arm associated with Plaintiff's neck pain. (*See* Doc. 11-7 at Tr. 447–48, 450–51, PAGEID #: 508–09, 511–12). Further, the ALJ failed to note Plaintiff's complaints of neck pain, and the accompanying objective indicators of Plaintiff's neck pain, in April 2014. (*See* Doc. 11-8 at Tr.

633–34, PAGEID #: 695–96; *see id.* at Tr. 634, PAGEID #: 696 (neck pain, numbness in the arms, left arm pain, diminished motor strength, and no left biceps reflex)).

The ALJ's treatment of Plaintiff's back pain and the effectiveness of his third surgery was no different.  The ALJ explained that Plaintiff sought "emergency room care on one occasion due to mid back pain" prior to his surgery.  (Doc. 11-2 at Tr. 27, PAGEID #: 83 (citing a hospital visit from January 2013)).  This account leaves out Plaintiff's pre-surgery hospital visit and examination in June 2013.  (*See* Doc. 11-7 at Tr. 380, PAGEID #: 441; *see also id.* at Tr. 371, PAGEID #: 432 (Dr. Ammirati, observing Plaintiff's "long history of low back pain" that had "been progressively worsening" since his May surgery, as well as Plaintiff's numbness and pain that radiated down both legs into his feet and toes); *id.* at Tr. 502–04, PAGEID #: 563–65 (reports from the June 28, 2013, visit noting Plaintiff also experienced pain in his left hip and that he had a positive straight leg test)).  The ALJ also failed to note that Plaintiff sought treatment twice—once in mid-August 2013 and once in October 2013—for muscle spasms in his back and for back pain that extended into his legs.  (*See* Doc. 11-7 at Tr. 440, 443, PAGEID #: 501, 504).

        **3.**      **The ALJ's Remaining Reasons**

Setting aside the ALJ's selective citations to the record and the parts of his explanation contradicted by the record, two of the ALJ's reasons for downgrading Plaintiff's credibility remain: that Plaintiff "worked at numerous positions prior to the alleged disability onset date but only for a few years at time," and that Plaintiff traveled to Florida at some point following his alleged onset date. (Doc. 11-2 at Tr. 28, PAGEID #: 84).  Assuming both are true and that the ALJ's treatment of both is fair (*but see* Doc. 11-2 at Tr. 46, PAGEID #: 102 (Plaintiff testifying that he was never fired from any job and only left his prior positions to find a better one)), the

undersigned cannot conclude that these two points qualify as substantial evidence. As explained, the record demonstrates that Plaintiff consistently complained of back and neck pain since his alleged onset date. *See Rogers*, 486 F.3d at 248 ("Consistency between a claimant's symptom complaints and the other evidence in the record tends to support the credibility of the claimant . . . ."). Moreover, he consistently sought treatment for those problems through regular hospital and doctor visits over a multi-year span, and he opted for surgery three times to alleviate his pain. Given Plaintiff's testimony, the records documenting three surgeries for back and neck pain, the records documenting Plaintiff's consistent efforts to address the pain, and the records documenting the continuation of his pain after each surgery, no reasonable mind would accept the ALJ's two remaining reasons as adequate to support his credibility determination. *See Rogers*, 486 F.3d at 241.

B.   The Remaining Assignment of Error

Plaintiff also argues the ALJ erred by relying on the opinions of two non-examining medical experts who gave their assessments in 2012, before Plaintiff underwent the three surgeries at issue. (*See* Doc. 12 at 3–6). This argument has some merit. *See Short v. Comm'r of Soc. Sec.*, No. 1:12-CV-94, 2013 WL 428747, at *11 (S.D. Ohio Feb. 1, 2013) ("[W]here . . . much of the evidence . . . post-dates the reviewer's opinion and the ALJ nonetheless credits the state agency reviewer's opinion, the ALJ must acknowledge that fact *and provide sufficient reasons for doing so . . . .*" (emphasis added)), *report and recommendation adopted*, No. 1:12-CV-94, 2013 WL 1281639 (S.D. Ohio Mar. 26, 2013); *see also Little v. Comm'r of Soc. Sec.*, No. 2:14-CV-532, 2015 WL 5000253, at *12 (S.D. Ohio Aug. 24, 2015). Nevertheless, the Court's decision to reverse and remand on the ALJ's credibility determination obviates the need for an in-depth analysis of Plaintiff's remaining assignment of error, which the

16

ALJ may consider on remand. *See Bronstetter v. Comm'r of Soc. Sec.*, No. 3:14-CV-00112, 2015 WL 4540395, at *4 (S.D. Ohio May 18, 2015); *Cox v. Comm'r of Soc. Sec.*, No. 2:13-CV-1203, 2015 WL 1000648, at *3 n.1 (S.D. Ohio Mar. 5, 2015).

## IV. CONCLUSION

For the reasons stated, it is **RECOMMENDED** that Plaintiff's statement of errors be **SUSTAINED**, and that the District Court **REVERSE** the Commissioner's nondisability finding and **REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g).

## V. PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A district judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. §636(b)(1). Failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140, 152–53 (1985).

IT IS SO ORDERED.

Date: July 18, 2016               /s/ Kimberly A. Jolson
                                  KIMBERLY A. JOLSON

UNITED STATES MAGISTRATE JUDGE